IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-19
No. 376A20

Filed 11 March 2022

JAMES C. BUTTON

v.

LEVEL FOUR ORTHOTICS & PROSTHETICS, INC., LEVEL FOUR SBIC

HOLDINGS, LLC, PENTA MEZZANINE SBIC FUND I, L.P., REBECCA R. IRISH,

and SETH D. ELLIS

Appeal by defendants pursuant to N.C.G.S. § 1-277(b) and cross-appeal by plaintiff pursuant to N.C.G.S. § 7A-27(a)(3)(a) from an order entered 13 March 2020 in the North Carolina Business Court, Forsyth County by Judge Michael L Robinson. Heard in the Supreme Court 6 October 2021.

*Mullins Duncan Harrell & Russell PLLC, by Alan W. Duncan, Stephen M. Russell, Jr., and Tyler D. Nullmeyer, for plaintiff.*

*Robinson, Bradshaw & Hinson, P.A., by Brian L. Church and David C. Wright, III, for defendants.*

BERGER, Justice.

On March 13, 2020, the trial court entered an order dismissing without prejudice plaintiff James Button's claims for declaratory judgment against Level Four SBIC Holdings (Level Four Holdings). In addition, the trial court dismissed plaintiff's claim for tortious interference with contract against Penta Mezzanine SBIC

Fund I, L.P. (Penta Fund), Level Four Holdings, and Seth Ellis. The trial court also denied motions to dismiss for lack of personal jurisdiction by Level Four Holdings and Ellis. Level Four Holdings and Ellis filed a notice of appeal as to the trial court's denial of their motions to dismiss for lack of personal jurisdiction. Plaintiff filed a notice of cross-appeal from the trial court's order partially granting defendants' motions to dismiss. Plaintiff acknowledged that the order from which he was attempting to appeal was interlocutory, but he argues that the appeal affects a substantial right. Alternatively, plaintiff filed a petition for writ of certiorari, arguing that this Court should allow review of the trial court's dismissal without prejudice of his claims for declaratory judgment and for tortious interference with contract.

## I.  Factual and Procedural Background

Penta Fund is a limited partnership formed in Delaware with its principal place of business in Winter Park, Florida. Penta Fund is a manager and majority owner of Level Four Holdings and minority shareholder of Level Four Orthotics & Prosthetics, Inc. (Level Four Inc.). Level Four Holdings, a Florida corporation with its principal place of business in Winter Park, Florida, is the majority shareholder of Level Four Inc., a North Carolina corporation with its principal place of business in Winston-Salem, North Carolina.

In July 2017, plaintiff, a citizen of New Jersey, entered into an employment agreement (the Employment Agreement) with Level Four Inc. to serve as its Chief

Executive Officer. Plaintiff negotiated the terms of his employment with Rebecca Irish (Irish) and Ellis, both of whom are residents of Florida. During these negotiations, Irish "simultaneously represented Level Four Inc., Level Four Holdings, and Penta Fund." At all times relevant to the current dispute, Irish concurrently acted as "the sole director of Level Four Inc., a manager of Level Four Holdings, and a managing partner and investment committee member of Penta Fund." Ellis was the managing partner of Penta Fund and a member on its investment committee.

¶ 4 In addition to the Employment Agreement, plaintiff entered into a Warrant Agreement with Level Four Inc. Further, with Level Four Holdings, plaintiff entered into an Option Agreement, Stock Repurchase Agreement, Go Shop Provision with Future Sale Agreement (Go Shop Agreement), and Shareholder Voting Agreement (collectively, the Level Four Holdings Agreements).

**A. The Employment Agreement and Warrant Agreement with Level Four Inc.**

¶ 5 The Employment Agreement allowed Level Four Inc. to terminate plaintiff's employment with or without cause. Termination without cause entitled plaintiff to a thirty-day written notice along with several severance benefits. If terminated for cause, plaintiff would not be entitled to notice or severance benefits. Pursuant to the Employment Agreement, termination for cause was permissible for "any willful misconduct or gross negligence which could reasonably be expected to have a material adverse affect [sic] on the business and affairs of [Level Four Inc.]." "Willful

misconduct" under the agreement was defined as conduct that a court determines "to be knowingly fraudulent or deliberately dishonest." Additionally, during employment negotiations, plaintiff learned of and became concerned with the amount of debt Level Four Inc. owed to Penta Fund. As a result, plaintiff negotiated for a clause to be included in the Employment Agreement whereby the interest rates on promissory notes payable to Penta Fund by Level Four Inc. would "be reduced to no greater than the two- and one-half percent (2.5%) at all times subsequent to July 1, 201[7]."

¶ 6        Under the Warrant Agreement, plaintiff had the right to purchase 30% of Level Four Inc.'s common stock, subject to certain vesting requirements. Notably, plaintiff's rights under the Warrant Agreement would fully vest without regard to the duration of his employment if his employment was terminated without cause. However, if plaintiff's employment was terminated for cause, no further rights under the Warrant Agreement would vest.

**B. The Level Four Holdings Agreements**

¶ 7        Pursuant to the Option Agreement, plaintiff had the right to purchase 21% of Level Four Inc.'s common stock, along with over $3 million worth of notes plus accrued interest owed to Penta Fund by Level Four Inc. Plaintiff's voluntary resignation or termination for cause would eliminate his right to exercise the option contained in the Option Agreement. Otherwise, a termination without cause would

allow plaintiff's rights under the Option Agreement to continue until they naturally expired.

¶ 8      The Stock Repurchase Agreement concerned what rights Level Four Holdings had regarding stock obtained by plaintiff pursuant to the Warrant Agreement and Option Agreement. If plaintiff's employment was terminated without cause, Level Four Holdings would not have the ability to purchase stock acquired by plaintiff under the Option Agreement but would be allowed to purchase stock acquired by plaintiff under the Warrant Agreement. Alternatively, if plaintiff's employment was terminated for cause, Level Four Holdings would have the option to purchase stock acquired by plaintiff under both the Option Agreement and Warrant Agreement.

¶ 9      Finally, under the Go Shop Agreement, plaintiff was given the right to submit a competing offer to purchase Level Four Inc. within a thirty-day period should Level Four Holdings agree to an offer to sell Level Four Inc. to a third party. Plaintiff's termination for cause or voluntary resignation would immediately terminate these rights. If plaintiff's employment was terminated without cause, however, his rights under the Go Shop Agreement would continue for six months from the date of his "without cause" termination.

## C. Plaintiff's employment and subsequent termination

¶ 10     Upon plaintiff's employment as CEO, Level Four Inc. owed Penta Fund close to $10 million in long-term debt bearing various interest rates of up to 18%. Pursuant

to the Employment Agreement, however, the interest rate on the debt owed by Level Four Inc. was reduced to 2.5%. In November 2018, plaintiff sought an additional loan from Penta Fund. On December 12, 2018, Irish conditioned the additional funding with an 8% interest rate applicable to both new and existing amounts owed to Penta Fund. Plaintiff refused to agree to any modification regarding the interest rate provision in the Employment Agreement and believed implementation of an 8% interest would violate the Employment Agreement.

¶ 11       Despite plaintiff's objection to increasing the interest, Penta Fund wired funds to Level Four Inc. on December 12, 2018. On that day, as well as on February 21, 2019, Irish and Ellis presented to plaintiff promissory notes with an interest rate of 8%, and plaintiff refused to sign the notes. On a February 21, 2019, conference call, Ellis informed plaintiff that the promissory note needed to be signed.

¶ 12       Plaintiff traveled to North Carolina on March 20, 2019, to meet with employees and attend various meetings. One of the meetings included a conference call with Penta Fund's Investment Committee. During this call, plaintiff was given an opportunity to resign. When he refused, plaintiff was informed by Irish that his employment with Level Four Inc. was being terminated for cause. Plaintiff contends he has not been provided with a reason for his termination, specifically regarding the classification as for cause. Upon termination of plaintiff's employment, Irish was appointed CEO of Level Four Inc.

¶ 13        On May 30, 2019, plaintiff filed a complaint in this matter, and the case was designated as a complex business case. Plaintiff sought, among other things, a declaratory judgment setting forth his specific rights under the Employment Agreement and Level Four Holdings Agreements. Plaintiff also alleged claims for tortious interference with contract against Penta Fund, Ellis, Level Four Holdings, and Irish. Defendants moved to dismiss all claims against Level Four Holdings and Ellis for lack of personal jurisdiction.

¶ 14        On March 13, 2020, the trial court determined that it did not have subject matter jurisdiction over plaintiff's declaratory judgment claim because no actual controversy existed and dismissed that claim against Level Four Holdings without prejudice under Rule 12(b)(1). The trial court also dismissed without prejudice plaintiff's claims for tortious interference with contract against Penta Fund, Level Four Holdings, and Ellis pursuant to Rule 12(b)(6). The trial court determined that plaintiff's allegations of malice were insufficiently pled in the complaint. Further, the trial court denied defendant's motion to dismiss for lack of personal jurisdiction over Level Four Holdings and Ellis. Plaintiff and defendants cross-appeal, both arguing the trial court erred in making the above rulings.

¶ 15        The initial question we must address is whether plaintiff's appeal is properly before this Court. An order is either "interlocutory or the final determination of the rights of the parties." N.C.G.S. § 1A-1, Rule 54(a) (2021). Interlocutory orders are

generally not immediately appealable. N.C.G.S. § 7A-27 (2021). However, interlocutory orders from the Business Court may be appealed to this Court if the order affects a substantial right. N.C.G.S. § 7A-27(a)(3)(a). "Ordinarily, an appeal from an interlocutory order will be dismissed as fragmentary and premature unless the order affects some substantial right and will work injury to appellant if not corrected before appeal from final judgment." *Goldston v. Am. Motors Corp.*, 326 N.C. 723, 726, 392 S.E.2d 735, 736 (1990) (quoting *Stanback v. Stanback,* 287 N.C. 448, 453, 215 S.E.2d 30, 34 (1975)).

¶ 16　　　　Plaintiff argues that dismissal of his declaratory judgment action and claim for tortious interference with contract affect a substantial right because of the possibility of inconsistent verdicts. *See Cook v. Bankers Life & Cas. Co.*, 329 N.C. 488, 491, 406 S.E.2d 848, 850 (1991). Plaintiff contends that similar factual issues must be resolved with regard to the classification of his termination and determination of whether defendants acted with malice. Failure to resolve these issues now, plaintiff argues, would potentially require these similar factual issues to be determined at separate trials.

¶ 17　　　　Plaintiff's argument, however, fails to appreciate that the dismissal of his claims was without prejudice. As not all relief has been denied, it follows that no substantial right has been affected and plaintiff's appeal is premature. *See Day v. Coffey*, 68 N.C. App. 509, 510, 315 S.E.2d 96, 97 (1984) ("When the court allows

amendment, relief in the trial court has not been entirely denied and appeal is premature. . . . Plaintiffs have an opportunity to correct the deficiency in the trial court without affecting their cause of action. Prosecuting an appeal, when simple and economical corrective measures might be taken without prejudice in the trial court, is exactly the sort of wasteful procedure which our appellate courts have consistently disapproved."). Because no substantial right has been affected, plaintiff's interlocutory cross-appeal is improper and defendant's motion to dismiss plaintiff's cross-appeal is allowed.

¶ 18        Plaintiff alternatively petitions this Court pursuant to Rule 21 of the Rules of Appellate Procedure for a writ of certiorari to review the trial court's dismissal of his declaratory judgment action and claim for tortious interference with contract. A

> writ of certiorari may be issued in appropriate circumstances by either appellate court to permit review of the judgments and orders of trial tribunals when the right to prosecute an appeal has been lost by failure to take timely action, or when no right of appeal from an interlocutory order exists, or for review pursuant to N.C.G.S. § 15A-1422(c)(3) of an order of the trial court ruling on a motion for appropriate relief.

N.C. R. App. P. 21.

¶ 19        A writ of certiorari is intended "as an extraordinary remedial writ to correct errors of law." *State v. Simmington*, 235 N.C. 612, 613, 70 S.E.2d 842, 843–44 (1952). A petitioner "must show 'merit or that error was probably committed below[.]'" *State v. Ricks*, 2021-NCSC-116, ¶ 6, 378 N.C. 737, 741 (quoting *State v. Grundler*, 251 N.C.

177, 189, 111 S.E.2d 1, 9 (1959)); *See also In re Snelgrove*, 208 N.C. 670, 182 S.E. 335, 336 (1935) ("Certiorari is a discretionary writ, to be issued only for good or sufficient cause shown, and the party seeking it is required . . . to show merit or that he has reasonable grounds for asking that the case be brought up and reviewed on appeal.").

For the reasons stated below, plaintiff has failed to show that his petition has merit or that error was probably committed by the Business Court, and we deny his petition for writ of certiorari.

## II.    Analysis

### A.  Plaintiff's declaratory judgment claim against Level Four Holdings

A court shall dismiss an action when it appears that the court lacks subject matter jurisdiction. N.C.G.S. § 1A-1, Rule 12(h)(3) (2019). As a jurisdictional prerequisite, the Declaratory Judgment Act requires "the pleadings and evidence [to] disclose the existence of an actual controversy between the parties having adverse interests in the matter in dispute." *Gaston Bd. of Realtors v. Harrison*, 311 N.C. 230, 234, 316 S.E.2d 59, 61 (1984). This controversy between the parties must exist "at the time the pleading requesting declaratory relief [was] filed." *Sharpe v. Park Newspapers of Lumberton, Inc.*, 317 N.C. 579, 583, 347 S.E.2d 25, 29 (1986). Absolute certainty of litigation is not required, but the plaintiff must demonstrate "to a practical certainty" that litigation will arise. *Ferrell v. Dep't of Transp.*, 334 N.C. 650,

656, 435 S.E.2d 309, 314 (1993).

¶ 22        Plaintiff in the present case seeks a decision concerning his rights under the Employment Agreement and the collective Level Four Holdings Agreements. Essentially, plaintiff requests a determination as to whether his termination from Level Four Inc. was with or without cause. Plaintiff's rights under the various agreements differ significantly based on this classification.

¶ 23        Pursuant to the Employment Agreement, determination of whether to terminate plaintiff's employment was a decision to be made by Level Four Inc., not Level Four Holdings. Thus, any actual controversy and subsequent litigation regarding the classification would be directed toward Level Four Inc. Plaintiff's complaint does not establish the existence of an actual controversy between himself and Level Four Holdings that is practically certain to result in litigation.

¶ 24        Regarding the Level Four Holdings Agreements, plaintiff's complaint does not establish his intent or ability to exercise his rights under the Option Agreement, an attempt by Level Four Holdings to exercise its rights under the Stock Repurchase Agreement, or that a contemplated sale will trigger any rights under the Go Shop Agreement. Although one can imagine scenarios from which litigation could arise under such agreements, litigation cannot be a practical certainty in the absence of a party attempting to exercise rights under the various agreements.

¶ 25        Plaintiff's argument is couched in the notion that Level Four Holdings may

breach the various agreements at some future date. However, whether any future act would constitute a breach is dependent on whether plaintiff's employment was terminated for cause. With that issue still pending before the trial court, this Court is unable to speculate as to what rights either party has and what future acts would constitute a breach. Plaintiff's argument is insufficient to establish an actual controversy between himself and Level Four Holdings to satisfy the jurisdictional requirement of the Declaratory Judgment Act. *See Gaston Bd. of Realtors*, 311 N.C. at 234, 316 S.E.2d at 61.

As such, plaintiff has failed to demonstrate that his petition has merit or that the trial court committed error in dismissing his claim for declaratory judgment as to Level Four Holdings.

**B. Tortious interference with contract**

"A complaint should not be dismissed under Rule 12(b)(6) unless it affirmatively appears that the plaintiff is entitled to no relief under any state of facts which could be presented in support of the claim." *Embree Const. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 491, 411 S.E.2d 916, 920 (1992) (cleaned up). Practically, "the system of notice pleading affords a sufficiently liberal construction of complaints so that few fail to survive a motion to dismiss." *Id.* (cleaned up).

To establish a claim for tortious interference, the complaint must allege: (1) a valid contract existed between the plaintiff and a third person conferring contractual

rights to plaintiff against a third person; (2) defendant knew of the contract; (3) the defendant intentionally induced the third person not to perform the contract; (4) in not performing the contract the third person acted without justification; and (5) plaintiff suffered actual damages. *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988). The issue before us concerns the fourth element.

¶ 29 Corporate "non-outsiders" have a qualified privilege leading to a presumption that he or she acted in the corporation's best interest. *See Embree*, 330 N.C. at 498, 411 S.E.2d at 924 (discussing the privilege available to corporate insiders). "A non-outsider is one who, though not a party to the terminated contract, had a legitimate business interest of his own in the subject matter." *Smith v. Ford Motor Co.*, 289 N.C. 71, 87, 221 S.E.2d 282, 292 (1976). Non-outsiders include officers, directors, shareholders, and other corporate fiduciaries. *Embree*, 330 N.C. at 498, 411 S.E.2d at 924.

¶ 30 A non-outsider's actions, then, are presumed justified, and the presumption can only be overcome by a showing that the non-outsider acted with malice. *Ford Motor Co.* 289 N.C. at 87—88, 91, 221 S.E.2d at 292, 294. Essentially, the claimant "must allege facts demonstrating that [the] defendant's actions were not prompted by legitimate business purposes." *Embree*, 330 N.C. at 500, 411 S.E.2d at 926 (cleaned up). "General allegations which characterize defendant's conduct as malicious are insufficient as a matter of pleading." *Spartan Equip. Co. v. Air Placement Equip. Co.*,

263 N.C. 549, 559, 140 S.E.2d 3, 11 (1965). Further, "[i]n order to survive dismissal, a complaint alleging tortious interference must admit of no motive for interference other than malice." *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 372 N.C. 260, 285, 827 S.E.2d 458, 477 (2019) (cleaned up).

¶ 31    Penta Fund and Level Four Holdings are shareholders of Level Four Inc. Thus, Penta Fund and Level Four Holdings are considered non-outsiders and are entitled to a presumption that their actions were "prompted by legitimate business purposes" and in the best interest of Level Four Inc. *Embree*, 330 N.C. at 500, 411 S.E.2d at 926. To rebut this presumption, plaintiff must allege that Penta Fund and Level Four Holdings acted in their own personal interest. Further, his complaint "must admit of no motive for interference other than malice." *Link*, 371 N.C. at 285, 827 S.E.2d at 477.

¶ 32    Plaintiff's complaint states that Penta Fund and Level Four Holdings "intentionally induced Level Four Inc. not to comply with the Employment Agreement by classifying [plaintiff's] termination as 'for cause' in violation of the Employment Agreement and without justification." Such "willful interference," plaintiff alleges "was carried out to benefit themselves regardless of the negative repercussions on Level Four Inc." However, in the section of plaintiff's complaint alleging tortious interference, plaintiff fails to distinguish between the defendants and allege with specificity how each acted in their own personal interest. We are not

permitted to infer a personal interest upon which Penta Fund and Level Four Holdings acted from the allegations in the complaint.

¶ 33        Further, this Court has concluded that a stockholder's financial interest in a corporation allows for "a qualified privilege to interfere with contractual relations between the corporation and a third party." *Wilson v. McClenny*, 262 N.C. 121, 133, 136 S.E.2d 569, 578 (1964). Plaintiff's conclusory allegation does little to comply with the specific pleading requirements of a tortious interference claim that prohibit general allegations of malice, *Spartan*, 263 N.C. at 559, 140 S.E.2d at 11, and fails to rebut the qualified privilege afforded to Penta Fund and Level Four Holdings as non-outsiders, *Embree*, 330 N.C. at 500, 411 S.E.2d at 926, and stockholders. *Wilson*, 262 N.C. at 133, 136 S.E.2d at 578.

¶ 34        Regarding Ellis, whether he constituted a non-outsider is not dispositive. Plaintiff, again, makes only general allegations of malice which "are insufficient as a matter of pleading." *Spartan*, 263 N.C. at 559, 140 S.E.2d at 11. Plaintiff's complaint again fails to adhere to the strict pleading requirements when alleging tortious interference against Penta Fund, Level Four Holdings, and Ellis. As such, plaintiff's petition lacks merit and has failed to show error in the trial court's dismissal of his claims for tortious interference against Penta Fund, Level Four Holdings, and Ellis.

**C. Personal jurisdiction over Level Four Holdings and Ellis**

¶ 35        "The standard of review of an order determining [personal] jurisdiction is

whether the findings of fact by the trial court are supported by competent evidence in the record; if so, this Court must affirm the order of the trial court." *Tejal Vyas, LLC v. Carriage Park, L.P.*, 166 N.C. App. 34, 37, 600 S.E. 2d 881, 884 (2004), *per curiam affirmed*, 359 N.C. 315, 608 S.E.2d 751 (2005). "Where no findings are made, proper findings are presumed, and our role on appeal is to review the record for competent evidence to support these presumed findings." *Bruggeman v. Meditrust Acquisition Co.*, 138 N.C. App. 612, 615, 532 S.E.2d 215, 217–18, *appeal dismissed and disc. Review denied*, 353 N.C. 261, 546 S.E.2d 90 (2000). "If presumed findings of fact are supported by competent evidence, they are conclusive on appeal despite evidence to the contrary." *Tejal*, 166 N.C. App. at 37, 600 S.E.2d at 884.

¶ 36        Appellate courts consider the same evidence as the trial court when determining whether competent evidence exists to support the exercise of personal jurisdiction which includes: (1) any allegations in the complaint that are not controverted by the defendants' affidavits; (2) all facts in the affidavits; and (3) any other evidence properly tendered. *Banc of Am. Sec. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 694, 611 S.E.2d 179, 183 (2005); *Parker v. Town of Erwin*, 243 N.C. App. 84, 98, 776 S.E.2d 710, 722 (2015).

¶ 37        This Court engages in a two-step analysis when examining whether our courts can exercise personal jurisdiction over a non-resident defendant. *Beem USA Ltd.-Liab. Ltd. P'ship v. Grax Consulting LLC*, 373 N.C. 297, 302, 838 S.E.2d 158, 161

(2020). First, personal jurisdiction must be permitted by North Carolina's long-arm statute which allows a court to exercise jurisdiction over a defendant who "[i]s engaged in substantial activity within this State, whether such activity is wholly interstate, intrastate, or otherwise." N.C.G.S. § 1-75.4(1)(d) (2019). "This Court has held that this statute is 'intended to make available to the North Carolina courts the full jurisdictional powers permissible under federal due process.'" *Beem*, 373 N.C. at 302, 838 S.E.2d at 161 (quoting *Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 676, 231 S.E.2d 629, 630 (1977)). Second, "the Due Process Clause permits state courts to exercise personal jurisdiction over an out-of-state defendant so long as the defendant has certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.*, at 302, 231 S.E.2d at 162 (cleaned up).

¶ 38    Personal jurisdiction, then, cannot result from random, attenuated contacts, but instead must follow "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Skinner v. Preferred Credit*, 361 N.C. 114, 123, 638 S.E.2d 203, 210–11 (2006) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239-40 (1958)). Thus, a defendant's contacts with the forum state must be sufficient such that a defendant would "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

There are two types of personal jurisdiction: general and specific, with the latter being at issue in this case.

Specific jurisdiction "encompasses cases in which the suit arises out of or relates to the defendant's contacts with the forum." *Beem*, 373 N.C. at 303, 231 S.E.2d at 162 (cleaned up). Specific jurisdiction, "is, at its core, focused on the relationship among the defendant, the forum, and the litigation." *Id*. (cleaned up). A defendant's physical presence in the forum state is not a prerequisite to jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 283 (2014). While a contractual relationship between an out-of-state defendant and a North Carolina resident is not dispositive of whether minimum contacts exist, "a single contract may be a sufficient basis for the exercise of [specific personal] jurisdiction if it has a substantial connection with this State." *Tom Togs, Inc. v. Ben Elias Indus.s Corp.*, 318 N.C. 361, 367, 348 S.E.2d 782, 786 (1986). Finally, each defendant's contacts with the forum state must be analyzed individually. *Calder v. Jones*, 465 U.S. 783, 790 (1984).

Beginning with North Carolina's long-arm statute, the record makes clear that both Level Four Holdings and Ellis are "engaged in substantial activity within [North Carolina]," and it is irrelevant "whether such activity is wholly interstate, intrastate, or otherwise." N.C.G.S. § 1-75.4(1)(d). As further discussed below, a review of the record establishes the control over Level Four Inc., a North Carolina entity, that was exercised by Level Four Holdings and Ellis, and the exercise of personal jurisdiction

over Level Four Holdings and Ellis complies with North Carolina's long-arm statute. We now analyze both defendants' contacts individually to ensure that maintenance of the suit "does not offend traditional notions of fair play and substantial justice." *Beem*, 373 N.C. at 302, 838 S.E.2d at 161 (cleaned up).

¶ 41        The trial court's order set forth the "factual allegations that [were] relevant and necessary to the [trial court's] determination" including, that each of the Level Four Holdings Agreements defined "Corporation" as Level Four Inc. and selected North Carolina in the choice of law provisions; Irish acted simultaneously as the sole director of Level Four Inc., a manager of Level Four Holdings, and a managing partner and investment committee member of Penta Fund without ever differentiating the entity she was representing; Irish was actively involved in the management of Level Four Inc. and plaintiff's termination;  Level Four Inc.'s "corporate central functions" were in North Carolina; and plaintiff regularly conducted business in North Carolina as CEO of Level Four Inc.

¶ 42        The trial court stated that these factual allegations "tend[ed] to show that Level Four Holdings contemplated continuing obligations with [p]laintiff and Level Four Inc., [p]laintiff regularly performed work pertaining to the Employment Agreement in North Carolina, and the Employment Agreement and Level Four Holdings Agreements have a substantial connection with North Carolina."  "These facts," said the trial court, "support a conclusion that the [c]ourt may properly

exercise personal jurisdiction over Level Four Holdings."

¶ 43  Aside from the contractual relationship that existed, the trial court noted the actions of Level Four Holdings, through Irish, such as: negotiating the reduced interest rate of debt owed to Penta Fund by Level Four Inc.; terminating plaintiff's employment with Level Four Inc. while physically present in North Carolina; and increasing the interest rate on debt owed by Level Four Inc. to Penta Fund. This additional conduct, the trial court noted, "further supports the conclusion that the [c]ourt may properly exercise personal jurisdiction over Level Four Holdings."

¶ 44  Although not designated as findings of fact in the trial court's order, the factual allegations relied upon by the trial court do support its conclusion that personal jurisdiction is proper over Level Four Holdings. Additionally, though not discussed in the trial court's order, evidence contained in the record—including the uncontroverted allegations in the complaint, facts contained in the affidavits, and other properly admitted evidence—permits this Court to presume the trial court could have found the following: Level Four Holdings is the majority shareholder of Level Four Inc., a North Carolina entity; included in the Insurance section of the Employment Agreement is a requirement that Level Four Inc. or Penta Fund maintain insurance against liability on behalf of plaintiff so long as Level Four Holdings owned Level Four Inc. stock; and the Employment Agreement stated that Level Four Holdings and plaintiff would discuss relocating other Level Four Inc.

executive offices to New Jersey pending a review of Level Four Inc.'s personnel and costs.

¶ 45 The trial court's "factual allegations" that it relied on, coupled with the additional presumed findings discussed above, are supported by competent evidence. As such, they are conclusive on appeal. *Tejal*, 166 N.C. App. at 37, 600 S.E.2d at 884, *per curiam affirmed*, 359 N.C. 315, 608 S.E.2d 751 (2005).

¶ 46 Level Four Holdings' contacts with this state are neither random nor attenuated. Rather, they are evidence of Level Four Holdings purposefully availing itself of the privilege of conducting business in North Carolina. *See Skinner*, 361 N.C. at 123, 638 S.E.2d at 210–11 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Level Four Holdings could reasonably anticipate being haled into court in North Carolina when it selected North Carolina in the choice of law provision in the Employment Agreement and Level Four Holdings Agreements. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Moreover, Level Four Holdings could also anticipate continuing obligations with Level Four Inc. when it required Level Four Inc. to maintain specific insurance so long as Level Four Holdings owned stock in Level Four Inc., a North Carolina corporation with its principal place of business in North Carolina. Further evidence of its continuing obligation is the process by which Level Four Holdings was to discuss relocating Level Four Inc.'s executive offices away from the current location in Winston-Salem, North

Carolina after an assessment of Level Four Inc.'s personnel and costs. Such involvement with and control over Level Four Inc., a North Carolina entity, by Level Four Holdings, a majority shareholder, satisfy the minimum contacts required by due process.

¶ 47        Next, regarding Ellis, a court cannot "base personal jurisdiction on the bare fact of a defendant's status as . . . a corporate officer or agent," as such "would violate his due process rights." *Saft Am., Inc. v. Plainview Batteries, Inc.*, 189 N.C. App. 579, 595, 659 S.E.2d 39, 49 (2008) (Arrowood, J., dissenting), *reversed for reasons stated in dissent*, 363 N.C. 5, 673 S.E.2d 864 (2009) (per curiam). However, it is not simply Ellis's status that the trial court relied upon in determining it could properly exercise personal jurisdiction. The trial court recited Ellis's contacts with North Carolina alleged by plaintiff, including: negotiating the terms of plaintiff's employment with Level Four Inc.; negotiating the interest-rate provision in the Employment Agreement; discussing Level Four Inc.'s performance with plaintiff on at least fifteen occasions via telephone or e-mail; informing plaintiff that his termination was a unanimous decision of Penta Fund; and increasing the interest rate on the debt owed to Penta Fund by Level Four Inc. The trial court found that Ellis's contacts with North Carolina "establish [ ] that Mr. Ellis purposefully availed himself of the benefits of the forum," and "go directly to [p]laintiff's management of Level Four Inc. and the termination of his employment, which is the core of the subject matter of this

litigation." As a result, the trial court concluded that it could properly exercise personal jurisdiction over Ellis.

¶ 48    Again, the record contains competent evidence to support the factual allegations relied on by the trial court, and they are conclusive on appeal. *Tejal*, 166 N.C. App. at 37, 600 S.E.2d at 884, *per curiam affirmed*, 359 N.C. 315, 608 S.E.2d 751 (2005). It is these acts by Ellis that plaintiff claims violated the Employment Agreement and for which Ellis could "reasonably anticipate being haled into court" in North Carolina. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Similar to Level Four Holdings, the record contains competent evidence of Ellis's control of Level Four Inc., a North Carolina entity. It follows that plaintiff's suit arises out of Ellis's contacts with North Carolina through his control over Level Four Inc., a North Carolina entity, and that personal jurisdiction can be properly exercised over Ellis. *See Beem*, 373 N.C. at 303, 838 S.E.2d at 162 (stating that specific jurisdiction encompasses cases in which the suit arises out of or relates to the defendant's contacts with the forum). As such, the trial court was correct in determining personal jurisdiction exists over both Level Four Holdings and Ellis.

### III.    Conclusion

¶ 49    For the foregoing reasons, this Court concludes plaintiff has failed to demonstrate a substantial right has been affected or that an error likely occurred at the trial court. Further, North Carolina's long arm statute, in conjunction with both

Level Four Holdings's and Ellis's sufficient minimum contacts with North Carolina, allow for the trial court to exercise personal jurisdiction. In conclusion, defendants' motion to dismiss plaintiff's notice of cross-appeal is allowed; plaintiff's petition for writ of certiorari is denied; and the decision of the trial court regarding personal jurisdiction is affirmed.

AFFIRMED.

Justice EARLS concurring in part and dissenting in part.

I concur in the majority's conclusion that Level Four Holdings and Ellis are subject to the trial court's personal jurisdiction. However, I write separately to explain my disagreement with how the majority disposes of Button's interlocutory appeal and petition for a writ of certiorari. In particular, I disagree with the majority's conflation of the standard for determining whether a writ of certiorari should be issued with an analysis of the ultimate merits of Button's claims. In this case, I believe our interest in judicial economy justifies issuing a writ of certiorari. On the merits, I would affirm the trial court's dismissal of Button's declaratory judgment claim against Level Four Holdings but reverse the court's dismissal of his tortious interference claims against Penta Fund, Level Four Holdings, and Seth Ellis.

## I.    Button's interlocutory appeal and petition for writ of certiorari

Button seeks interlocutory review of the trial court's dismissal of his declaratory judgment claim against Level Four Holdings and his claim for tortious interference with contract against Penta Fund, Level Four Holdings, and Ellis. Button invokes two procedural mechanisms in his effort to bring the trial court's dismissal of his claims before this Court on interlocutory review. First, he invokes N.C.G.S. § 7A-27(a)(3)(a) in arguing that the trial court's actions implicate a substantial right based on the risk of inconsistent verdicts, given that the trial court

allowed his claims to proceed as against other defendants. Second, he invokes N.C.G.S. § 7A-32(b) and Rule 21 of the North Carolina Rules of Appellate Procedure in arguing that this Court should issue a writ of certiorari in the interests of judicial economy and to avoid fragmentary and piecemeal appellate review. The majority decides that neither ground provides a basis for allowing interlocutory review, dismissing Button's cross-appeal and denying his petition for writ of certiorari. Yet, curiously, the majority appears to rule on the substantive merits of both claims. In so doing, the majority reaches out to decide two issues that, by its own account, are not properly before this Court. The majority's handling of these two claims risks muddling our standard for determining when interlocutory review is appropriate.

¶ 52    For example, the majority seems to imply that interlocutory review is not warranted pursuant to N.C.G.S. § 7A-27(a)(3)(a) because "the dismissal of [Button's] claims was without prejudice." To begin with, this rationale does not address Button's actual argument; because his declaratory judgement claim and his tortious interference claim survived as against one of the defendants, Irish, the fact that his claims were dismissed without prejudice as against other defendants does not obviate the risk of inconsistent verdicts arising from two separate trials. Regardless, this rationale appears to offer cold comfort given that, just a few paragraphs later, the majority proceeds to (1) conduct a review of Button's declaratory judgment claim and conclude, on the merits, that there is no actual controversy, and (2) examine the

merits of Button's tortious interference claim in significant detail.

¶ 53    Ostensibly, the majority analyzes the substance of Button's claims in the course of concluding that his writ of certiorari should be denied. The majority is correct that, in determining whether a petition for writ of certiorari should be granted or denied, an appellate court must assess whether the claim has "merit," as we recently noted in *State v. Ricks*. 378 N.C. 737, 2021-NCSC-116, ¶ 1 ("[A]n appellate court may only consider certiorari when the petition shows merit, meaning that the trial court probably committed error at the hearing."). But a determination as to whether a petition for writ of certiorari should be granted is prior to and distinct from a resolution of the ultimate merits of a claim—a court must issue a writ of certiorari "in order to *reach* the merits" of a claim. *In re A.C.*, 378 N.C. 377, 2021-NCSC-91, ¶ 7 n.3 (emphasis added). Thus, at this stage, the question is whether "there is merit to an appellant's substantive arguments" such that certiorari should be granted and the merits reached, not whether the appellant's substantive arguments will ultimately succeed. *Zaliagiris v. Zaliagiris*, 164 N.C. App. 602, 606 (2004).

¶ 54    It cannot be and has never been the case that a litigant must prevail on the merits in order to demonstrate that a writ of certiorari should be issued. *See id.* at 606, 610 (2004) (exercising discretion under Rule 21 to grant certiorari "to consider the full merits of this appeal" but concluding with respect to one issue that "the trial court did not abuse its discretion"). More importantly, it cannot be and has never been

the case that a litigant who has failed to demonstrate that certiorari is warranted necessarily must lose when their substantive claim is resolved in due course. *See, e.g.*, *Peaseley v. Virginia Iron, Coal & Coke Co.*, 282 N.C. 585, 595 (1973) ("[D]enials of [c]ertiorari do not constitute approval of either the reasoning or the merits of the prior decisions of the [lower tribunal]."). Certiorari is, as the majority notes, "an extraordinary remedial writ." Not every litigant who fails to demonstrate that his or her case is "extraordinary" must fail when the merits of his or her claim are ultimately resolved.

¶ 55         Because the Court in this case has dismissed Button's cross-appeal and denied certiorari, its substantive analysis of Button's declaratory judgment and tortious interference with contract claims must be understood as nothing more than an illustrative examination of their "merit" relevant solely for the purposes of justifying the majority's decision to deny certiorari and not for any other purpose. The majority does not—and, in accordance with its own ruling that these claims are not before this Court, cannot—conclusively resolve the issues of whether Button has properly stated a claim under the Declaratory Judgment Act or for tortious interference with contract. Any attempt to resolve an issue not presently before the Court "would constitute an advisory opinion on abstract questions, and this court will not give advisory opinions or decide abstract questions." *Kirkman v. Wilson*, 328 N.C. 309, 312 (1991) (cleaned up). Still, the majority's imprecision risks conflating two distinct

analyses and preempting any effort Button may choose to undertake to amend his complaint regarding claims that have been dismissed without prejudice. A party need not prove their case in order to obtain a writ of certiorari, and an appellate court's refusal to issue the writ on an interlocutory appeal does not dictate the outcome on the merits in future proceedings.

¶ 56    In addition to my concerns about the majority's analytical approach, I also depart from the majority's decision not to grant certiorari and reach the merits of Button's declaratory judgment and tortious interference claims. Under Appellate Rule 21, this Court may issue the writ of certiorari "in appropriate circumstances . . . to permit review of the judgments and orders of trial tribunals . . . when no right of appeal from an interlocutory order exists." N.C. R. App. P. 21(a)(1). Our Rules of Appellate Procedure aim to promote the efficient disposition of appeals, and we have previously issued the writ in order to "prevent fragmentary and partial appeals." *Pelican Watch v. U.S. Fire Ins. Co.*, 323 N.C. 700, 702 (1989). As the Court of Appeals has explained, while reviewing interlocutory orders is ordinarily inefficient, there exist "exceptional cases where judicial economy will be served by" issuing a writ of certiorari and "consider[ing] the order [of a lower tribunal] on its merits." *Carolina Bank v. Chatham Station, Inc.*, 186 N.C. App. 424, 428 (2007); *see also Valentine v. Solosko*, 270 N.C. App. 812, 814, *review denied*, 376 N.C. 537 (2020) (issuing writ in the interest of "judicial economy").

¶ 57    Three aspects of Button's case lead me to the conclusion that his appeal presents one of those "exceptional case[s]" where issuing a writ of certiorari and conclusively resolving the merits of the defendants' motions to dismiss serves our interest in judicial economy. First, because this Court did not previously rule on Button's cross-appeal and petition for writ of certiorari, the merits of Button's declaratory judgment and tortious interference claims have been fully briefed and argued at this Court. Second, because the trial court ruled that Button could proceed on his declaratory judgment and tortious interference claims as against other defendants, resolving the legal issues surrounding these claims now would likely serve "the interests of judicial economy." *Robinson, Bradshaw & Hinson, P.A. v. Smith*, 139 N.C. App. 1, 9 (2000). Because issues that may be decisive in determining the ultimate merits of Button's surviving claims are presently before us, denying certiorari in this case "encourage[s] rather than prevent[s] fragmentary and partial appeals." *Pelican Watch*, 323 N.C. at 702. Third, the case is already before us on defendants' appeal as of right on the question of personal jurisdiction. Under these circumstances, I believe Button's claims have sufficient merit to justify us exercising our authority to accept review and offer a conclusive resolution of the legal issues presented.

## II.    Button's declaratory judgment and tortious interference claims

¶ 58    Turning to the merits, I largely agree with the majority's analysis and would

hold that Button has failed to state a cognizable claim arising under the Declaratory Judgment Act. In his complaint, Button does not allege that he has attempted to exercise any of the rights afforded to him under the Option Agreement, nor that he imminently intends to do so or that any of the defendants have exercised or intend to exercise any of their rights based upon their contention that the Employment Agreement was terminated for cause. It is certainly possible that litigation *may* arise should any of these events come to pass but, as the majority correctly notes, Button has failed to demonstrate "to a practical certainty" that litigation is imminent. *Sharpe v. Park Newspapers of Lumberton, Inc.*, 317 N.C. 579, 590 (1986); *see also Chapel H.O.M. Assocs., LLC v. RME Mgmt., LLC*, 256 N.C. App. 625, 629–30 (2017) ("To satisfy the jurisdictional requirement of an actual controversy, it must be shown in the complaint that litigation appears unavoidable. Mere apprehension or the mere threat of an action or suit is not enough."). Accordingly, on the merits, I would affirm the trial court's dismissal of this claim.

However, I disagree with the majority's analysis of Button's tortious interference claim and would conclude that he has stated a claim for tortious interference against Penta Fund, Level Four Holdings, and Ellis. Although the majority correctly recites the elements of a tortious interference claim involving corporate non-outsiders, the majority suggests an unduly stringent standard inconsistent with notice pleading principles. The majority also ignores numerous

relevant factual allegations contained in Button's complaint.

¶ 60    It is a longstanding principle in North Carolina that potentially meritorious claims should generally be resolved on the merits, not dismissed on technical grounds. *See generally, e.g.*, *Hansley v. Jamesville & W.R. Co.*, 117 N.C. 565 (1895) (describing "our system of liberal pleading"). "[T]he spirit of the North Carolina Rules of Civil Procedure is to permit parties to proceed on the merits without the strict and technical pleadings rules of the past." *Henry v. Deen*, 310 N.C. 75, 82 (1984). Of course, a complaint must "allege[ ] the substantive elements of a legally recognized claim and . . . give[ ] sufficient notice of the events that produced the claim to enable the adverse party to prepare for trial." *Embree Const. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 490–91 (1992). But "[a] complaint should not be dismissed under Rule 12(b)(6) . . . unless it affirmatively appears that plaintiff is entitled to no relief under any state of facts which could be presented in support of the claim." *Ladd v. Est. of Kellenberger*, 314 N.C. 477, 481 (1985).

¶ 61    To survive a motion to dismiss, a complaint asserting tortious interference by a corporate non-outsider must allege that the defendant acted without justification. As the majority correctly notes, corporate non-outsiders are "entitled to a presumption that their actions 'were prompted by legitimate business purposes.' " Because corporate non-outsiders are presumed to act in the company's interests, they are afforded a "conditional or qualified" "privilege" to interfere with a contractual

obligation assumed by the company. *Smith v. Ford Motor Co.*, 289 N.C. 71, 91 (1976). A complaint asserting tortious interference against corporate non-outsiders must allege "malice" to displace this privilege. *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 372 N.C. 260, 285 (2019). Nonetheless, the majority goes too far in suggesting that "strict pleading requirements" apply in this context; rather, the "rule of liberal construction of complaints" still applies to a complaint alleging tortious interference by a corporate non-outsider. *Embree Const. Grp.*, 330 N.C. at 500.[1] The complaint need not affirmatively disprove the possibility that the corporate non-outsiders did act in the interests of the company. Rather, the complaint need only "allege facts demonstrating that defendants' actions were not prompted by 'legitimate business purposes.' " *Id.*

¶ 62 In the section of the complaint specifically addressing the tortious interference claim, Button alleged the following:

> 200. Upon information and belief, Penta Fund, Ms. Irish, Mr. Ellis, and Level Four Holdings intentionally induced Level Four Inc. not to comply with the Employment Agreement by classifying Mr. Button's termination as "for cause" in violation of the Employment Agreement and without justification.

---

[1] The sole case the majority appears to rely on in support of its assertion that "strict pleading requirements" apply to tortious interference claims is *Spartan Equip. Co. v. Air Placement Equip. Co.,* a case which both predates adoption of the North Carolina Rules of Civil Procedure and states nothing more than that "general allegations" of malice do not suffice in this context. 263 N.C. 549, 559 (1965). Indeed, the majority's characterization of the pleading requirements as "strict" finds no support in our caselaw and is inconsistent with our modern system of notice pleading.

> 201. Upon information and belief, the willful interference of Penta Fund, Ms. Irish, Mr. Ellis, and Level Four Holdings with Mr. Button's employment contract was carried out to benefit themselves regardless of the negative repercussions on Level Four Inc.
>
> 202. The actions of Penta Fund, Ms. Irish, Mr. Ellis, and Level Four Holdings as alleged herein constitute a reckless, intentional, conscious, and wanton disregard of Mr. Button's rights.
>
> 203. Penta Fund, Ms. Irish, Mr. Ellis, and Level Four Holdings knew or should have known that their actions were reasonably likely to, and actually did, injure Mr. Button.

Standing alone, these allegations are conclusory. However, in considering a motion to dismiss, we review "the whole complaint," not just isolated sections. *Smith v. Summerfield*, 108 N.C. 284, 289 (1891). In context, the factual basis for Button's allegation that the relevant defendants acted with malice is readily apparent.

¶ 63   Button's complaint contains a lengthy background section in which he alleges various facts common to all subsequent legal claims. In this section, he alleges that (1) Penta Fund was a manager and majority stakeholder in Level Four Holdings, which owned a majority interest in Level Four Inc.; (2) Irish and Ellis were both Managing Partners and Investment Committee members who had substantial financial interests in Penta Fund; (3) Level Four Inc. "relied substantially on loans from Penta Fund for the funding of its operations"; (4) the loans Level Four Inc. obtained from Penta Fund before Button was hired "bore interest at a range of

variable and fixed rates up to 18[ percent] per annum"; (5) Button negotiated for and secured a provision in his Employment Agreement limiting the interest rate Penta Fund could charge on loans extended to Level Four Inc. to 2.5 percent; (6) throughout his tenure, Button received exclusively positive feedback regarding his performance as CEO; (7) Irish, Ellis and Penta Fund all pressured Button to waive the interest rate-limiting provision in the Employment Agreement and agree to loans charging Level Four Inc. significantly higher interest rates; (8) Irish and Ellis "commingled the operations of Level Four Inc., Level Four Holdings, and Penta Fund"; (9) after Button was terminated, Irish installed herself as CEO of Level Four Inc. and entered into loan agreements allowing Penta Fund to charge Level Four Inc. an interest rate in excess of the rate limit contained in Button's Employment Agreement; (11) "[n]o Defendant, nor any other person or entity, has informed Mr. Button for the purported basis for his 'for cause' termination from Level Four Inc"; and (12) "[t]hese actions . . . have been taken to benefit Penta Fund and Penta Fund's investors" and "have increased the likelihood that Level Four Inc. . . . will become insolvent and required to seek bankruptcy protection." These factual allegations provide crucial context and support for Button's tortious interference claim.

¶ 64    As corporate non-outsiders to Level Four Inc., Ellis, Penta Fund, and Level Four Holdings enjoy the presumption that they were acting in Level Four Inc.'s interests when they allegedly caused Level Four Inc. to terminate the Employment

Agreement with Button. But Button has plainly alleged that these defendants were not acting in *Level Four Inc.'s* interests when they terminated his employment—he contends they were acting to further *their own* financial interests as Level Four Inc.'s creditors by firing him to get around the interest rate cap contained in the Employment Agreement. Common sense dictates that, generally speaking, debtors prefer lower interest rates to higher interest rates. Common sense also dictates that retaining a CEO with a flawless record of performance is preferable to firing one. Here, Button alleges that the defendants (1) sought loans charging Level Four Inc. higher interest rates than the loans Level Four Inc. would have received if the Employment Agreement had been respected, (2) terminated a CEO who had never received any negative performance feedback, and (3) personally benefitted from this result even as Level Four Inc.'s business prospects suffered. These factual allegations were sufficient to displace the presumption that the defendants were acting in Level Four Inc.'s interests and sufficient to state a claim for tortious interference.

The defendants may have a plausible explanation for why their alleged actions were justified. Or they may demonstrate that the facts are not as Button has alleged. But nothing in Button's complaint allows a court to plausibly infer that their actions served Level Four Inc.'s interests rather than their own personal interests. Button's complaint does not "reveal[ ] that the interference was justified or privileged" and it "admit[s] of no motive for interference other than malice." *Wells Fargo Ins. Servs.*

*USA, Inc.*, 372 N.C. at 285. Accordingly, I would hold that the trial court erred in granting the motion to dismiss Button's tortious interference claims as against Penta Fund, Level Four Holdings, and Ellis.

### III.    Conclusion

For the foregoing reasons, I concur with respect to the majority's conclusion that the trial court possessed personal jurisdiction over both Level Four Holdings and Ellis, and dissent with respect to the majority's decision not to reach the merits on Button's declaratory judgment and tortious interference claims. Were we to reach the merits, I would affirm the trial court's dismissal of Button's declaratory judgment claims; however, I would hold that Button has stated a cognizable claim for tortious interference as against Penta Fund, Level Four Holdings, and Ellis.

Justices HUDSON and ERVIN join in this opinion concurring in part and dissenting in part.